UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| THOMAS RICHARDS,<br><br>    Plaintiff,<br><br>v.<br><br>AOL MEDIA LLC,<br><br>    Defendant. | Case No: 1:25CV02448 (PTG/IDD) |

**PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO COMPEL ARBITRATION (ECF 19), MOTION TO DISMISS (ECF 21),
AND OPPOSITION TO PRELIMINARY INJUNCTION (ECF 17)**

**INTRODUCTION**

Plaintiff Thomas Richards, by counsel, responds to Defendant AOL Media LLC's Motion to Compel Arbitration (ECF 19), Motion to Dismiss (ECF 21), and Opposition to Plaintiff's Motion for Temporary Restraining Order/Preliminary Injunction (ECF 17). This consolidated response addresses all three filings and provides notice regarding the preliminary injunction hearing.

This case exists because Defendant refused to tell Plaintiff how to stop Defendant from scanning his emails. That is the beginning, middle, and end of this dispute.

On November 27, 2025, Thanksgiving Day, Plaintiff filed a consumer complaint with the Virginia Attorney General because he noticed that the new AOL terms would allow AOL to read his emails and he did not want this. He waited twenty days for a response before filing any

lawsuit. On December 17, 2025, after receiving no response, Plaintiff filed suit in Loudoun County Circuit Court.

On December 22, 2025, Defendant's counsel called Plaintiff's counsel. During that call, Plaintiff's counsel explained that the core of the dispute was simply the scanning of Plaintiff's emails and consented to provide Defendant an extension of time to respond to the state court Complaint if Defendant would agree to stop scanning Plaintiff's emails during the litigation. Defendant's counsel did not accept this offer and did not mention that privacy toggles existed.

On December 31, 2025, Plaintiff sent formal written notice to Defendant's legal department explicitly withdrawing consent and rejecting the modified Terms of Service.

Defendant said nothing. Then, on January 12, 2026, Plaintiff learned for the first time that Defendant had been scanning Plaintiff's emails since at least 2019 -- and continued scanning through January 7, 2026, despite Plaintiff's repeated requests to stop. Defendant does not deny this. Indeed, Defendant affirmatively asserts that since April 2019, it has been authorized to "analyze[] and store[] all communications content, including email content from incoming and outgoing mail." ECF 17 at 1-2.

On January 2, 2026, Defendant's Counsel told Plaintiff's Counsel that they would be representing AOL for the Federal case, Plaintiff's Counsel promptly forwarded the December 31, 2025 email withdrawing consent of the email searching. Defendant said nothing about any ability to toggle off the searching of emails.

On January 5, 2026, Defendant counsel and Plaintiff's counsel had a call in which Plaintiff asked again about stopping the searching of Plaintiff's emails. Defendant's counsel said

he was working very hard to find out this information but did not know. He also stated that he had forwarded Plaintiff's email to him from January 2 to AOL the day he received it.

On January 7, 2026, Defendant's counsel mentioned that "privacy toggles" existed. But counsel did not represent that these toggles had any legal effect. Defendant's own FAQs suggested there was no way to opt out of email scanning. Plaintiff had no basis to assume that informal dashboard settings would actually prevent scanning.

Only on January 12, 2026 -- in Defendant's Opposition to Preliminary Injunction -- did Defendant formally represent to this Court that the Privacy Policy makes the toggles legally binding. ECF 17 at 12-13. This is the first time Defendant cited the specific policy language stating that users may "withdraw…consent at any time" and "still be able to enjoy our Services."

Defendant's characterization of this litigation as "reactive" or "vexatious" is contradicted by every fact in the record. Plaintiff did not want to litigate. Plaintiff filed an attorney general complaint and waited. Plaintiff tried to stop the searching by speaking to Defendant's attorneys. Plaintiff sent formal notice. At every turn, Defendant refused to provide the information that would have made litigation unnecessary. Every hour Plaintiff's counsel spent on this matter -- including on Thanksgiving and on New Year's Eve -- was necessitated by Defendant's deliberate concealment of information that could have resolved this dispute on December 22, 2025, 5 days after the Virginia action was filed, and before the Federal action was filed.

## I. NOTICE REGARDING PRELIMINARY INJUNCTION

Plaintiff has disabled the privacy toggles that Defendant revealed on January 7, 2026. Based on Defendant's formal representation to this Court -- made for the first time on January 12,

2026 -- that these toggles are legally binding, Plaintiff is amenable to resolving the preliminary injunction through stipulation with Defendant.

However, Plaintiff remains uncertain whether his opt-out will be honored. Plaintiff cannot download his own emails to preserve them without accepting "click wrap" terms that may invalidate the very opt-out he selected. Until this Court resolves the parties' rights, Plaintiff has no assurance that his emails will not continue to be searched -- or that attempting to preserve his data will not be used against him.

Regardless of how the preliminary injunction issue is resolved, Plaintiff's damages claims proceed. Plaintiff did not agree to the 2018 Terms of Service allowing email searching, yet Defendant searched Plaintiff's emails since 2019. Plaintiff's claims for unauthorized scanning under the SCA and Wiretap Act, VCPA violations, and attorney's fees under all three statutes are not mooted by the toggle disclosure.

Defendant argues Plaintiff cannot show irreparable harm because he continued using his email account. ECF 17 at 11. This argument proves too much. Plaintiff has used his AOL email for twenty-five years. The alternative Defendant offered was to "close your AOL account" (Exhibit B -- FAQ 5) and lose access to decades of stored communications. Plaintiff's continued use of email -- while simultaneously seeking judicial relief -- does not demonstrate the absence of harm; it demonstrates the impossible choice Defendant imposed.

## II. OPPOSITION TO MOTION TO COMPEL ARBITRATION

### A. Plaintiff Opted Out, and Prior Arbitration Provisions Do Not Apply to Claims Not Yet Filed.

On December 15, 2025, Plaintiff sent formal written notice opting out of arbitration pursuant to Section 14(a)(ii).9 of the November 2025 Terms of Service. (Exhibit A)

Section 14(a)(ii).9 expressly provides:

"If you opt out of the Arbitration Agreement, you may exercise your right to a trial by jury or judge, as permitted by applicable law, but **any prior existing agreement to arbitrate disputes under a prior version of the Arbitration Agreement will not apply to claims not yet filed.**"

Plaintiff opted out on December 15, 2025. Plaintiff's claims were not filed until December 17, 2025 (state court) and December 23, 2025 (federal court). At the time Plaintiff opted out, his claims were "not yet filed."

Under the plain language of the 2025 Terms, "any prior existing agreement to arbitrate" -- including any arbitration provision in the 2017 or 2018 Terms of Service -- "will not apply" to Plaintiff's claims.

**B. The Claims in This Case Arise From Defendant's Deceptive 2026 Terms Rollout.**

Plaintiff's Complaint references the 2017 Terms of Service because Plaintiff believed -- and still believes -- that those were the Terms governing his account, given that he never accepted the 2018 Terms. But Plaintiff did not file this lawsuit to enforce the 2017 Terms. Plaintiff filed this lawsuit to stop Defendant from implementing the deceptive 2026 Terms.

The Complaint speaks for itself: it sought a temporary restraining order and preliminary injunction "prohibiting Defendant from implementing the new Terms of Service and Privacy

Policy." ECF 1 at 15. Plaintiff did not seek monetary damages. Plaintiff did not even specify a damage amount. Plaintiff sought only one thing: for this Court to stop the email searching before January 2, 2026.

The Court's own records document Plaintiff's urgency. Plaintiff's counsel filed this action on December 23, 2025 -- the day before a five-day holiday weekend -- specifically to obtain emergency relief before the January 2, 2026 effective date. Plaintiff's counsel personally ensured Defendant received the filings. Plaintiff's counsel called the Court repeatedly, including speaking with Judge Giles' clerk, pleading that if the TRO was not heard before January 2, it would be too late because Plaintiff's emails would be searched. The phone records and voicemails are in the Court's possession.

Now Plaintiff has learned the truth:

First, Defendant was already scanning Plaintiff's emails since at least 2019 -- for approximately six years without Plaintiff's knowledge or consent. ECF 17 at 1-2, ECF 22 at 5. The "future harm" Plaintiff desperately sought to prevent was already happening. Plaintiff first noticed unusual activity through stat counter data on January 1, 2026, but did not learn the full scope of Defendant's conduct until Defendant admitted it in its filings on January 12, 2026. Defendant continued scanning through January 7, 2026, when Plaintiff finally disabled searches through the hidden toggles.

Second, there was a hidden mechanism to opt out of email scanning that Defendant concealed throughout this litigation. Defendant's FAQs suggested no opt-out existed (stating that users who objected to the new terms must "close your AOL account.") (Exhibit B -- FAQ 5). Plaintiff's

counsel explicitly asked Defendant's counsel on December 22, 2025 how to stop the scanning. Defendant's counsel said over the phone that it was not up to him or within his control but AOL's and gave no way to opt out (also see Exhibit C). On January 5, 2026, Plaintiff's counsel asked again. Defendant's counsel said he was working very hard to find out but did not know. ECF 17-3. Defendant first disclosed the toggles on January 7, 2026, and first represented that those toggles have legal effect on January 12, 2026.

This is not vexatious litigation. This is a consumer who filed an AG complaint, waited twenty days, offered to resolve the dispute, and then desperately sought emergency relief from multiple courts -- all while Defendant concealed the very information that would have ended this dispute. This federal lawsuit would never have been filed if Defendant had disclosed on December 22 what it finally disclosed on January 12 -- that privacy toggles exist and have legal effect under the Privacy Policy.

The claims in this case arise from Defendant's deceptive conduct in rolling out the 2026 Terms. Plaintiff opted out of arbitration under those Terms. No prior arbitration agreement applies to claims that were "not yet filed" at the time of the opt-out.

**C. There Is a Genuine Factual Dispute as to Which Terms Govern, and Defendant Cannot Establish the Predicate for Arbitration.**

Defendant's Motion to Compel depends on establishing which Terms of Service govern Plaintiff's account. But Defendant cannot establish this on the current record.

Defendant's declarant, Robert Gurwin, claims that Plaintiff accepted the 2018 Terms in 2019.

ECF 17-2 ¶ 13. But Plaintiff has submitted a sworn declaration stating that he "intentionally

declined to accept" the 2018 Terms "each time" he was prompted. ECF 3 ¶ 17. Mr. Gurwin does

not claim personal knowledge of what Plaintiff did in 2019. He merely states that Plaintiff "must

have" clicked the "I Accept" button -- an inference from records, not testimony to fact. The

Account Management Tool screenshot shows only a timestamp; it does not show an actual click

event, IP address, device information, or any metadata establishing that Plaintiff personally

clicked "I Accept."

This factual dispute matters for two reasons. First, it undermines Defendant's consent defense to

the SCA and ECPA claims -- if Plaintiff never accepted the 2018 Terms, Defendant had no

authorization to scan Plaintiff's emails from 2019 forward. Second, it demonstrates that

Defendant cannot meet its burden to establish the existence and scope of any arbitration

agreement.

Regardless of whether the 2017 or 2018 Terms govern, both contain arbitration clauses. But

Section 14(a)(ii).9 of the 2025 Terms provides that "any prior existing agreement to arbitrate

disputes under a prior version of the Arbitration Agreement will not apply to claims not yet

filed." Plaintiff opted out on December 15, 2025. Plaintiff's claims were not yet filed. The opt-

out applies to whichever prior arbitration clause might otherwise govern -- whether the 2017 or

2018 version.

**D. The 2025 Terms Contain Irreconcilable Language That Must Be Construed Against Defendant.**

Even setting aside the above arguments, the 2025 Terms contain conflicting provisions regarding prior arbitration agreements that must be resolved in Plaintiff's favor.

On one hand, Section 14(a)(ii).9 states:

"any prior existing agreement to arbitrate disputes under a prior version of the Arbitration Agreement **will not apply to claims not yet filed**"

On the other hand, the same section states:

"If you opt out of this updated arbitration clause and were previously subject to an arbitration clause in effect prior to this updated arbitration clause, then that prior arbitration clause **shall remain** as part of the agreement between us."

These provisions are irreconcilable. A prior arbitration clause cannot simultaneously "not apply" and "remain as part of the agreement."

Under the doctrine of contra proferentem, ambiguous contract language is construed against the drafter. *See Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 28-29 (2019); *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 179 (2016). "In the event of an ambiguity in the written contract, such ambiguity must be construed against the drafter of the agreement." *Norfolk S. Ry. Co. v. Zayo Grp., LLC*, 87 F.4th 585, 592 (4th Cir. 2023) (applying Virginia law). The rule "is generally said to be a rule of last resort and is applied only when other secondary rules of interpretation have failed to elucidate the contract's meaning." *Id.* Here, ordinary interpretation methods have been exhausted -- the two provisions directly contradict each other. One says prior arbitration clauses "will not apply"; the other says they "shall remain." No amount of ordinary

construction can reconcile this conflict. Defendant drafted this language. Defendant must bear the consequences.

Where contract provisions seemingly conflict, the court must attempt to give effect to both if possible, but if that is not possible, the provision more specific to the matter at hand controls. *Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 158 (1993). The "will not apply to claims not yet filed" language is more specific because it addresses the precise situation at issue: claims that had not been filed at the time of the opt-out.

## E. The Purported Opt-Out Mechanism Was Illusory and Buried in Deceptive Language.

Even if some prior arbitration agreement existed, the purported mechanism for opting out of email scanning was illusory. An agreement lacks consideration when it consists entirely of illusory promises, as mutual obligations are fundamental to contract formation. *See Johnson v. Cont'l Fin. Co., LLC*, 131 F.4th 169 (4th Cir. 2025) (holding that a "change-in-terms" clause allowing one party to unilaterally modify the agreement rendered the arbitration agreement illusory); *Kiser v. Truist Fin. Corp.*, 796 F. Supp. 3d 207 (E.D. Va. 2025) (same).

Here, the opt-out was not merely difficult to find -- it was effectively nonexistent until Defendant chose to reveal it in litigation on January 12, 2026. Defendant's FAQs suggested there was no way to stop email scanning and that users who objected to the new terms must "close your AOL account." (Exhibit B – FAQ 5). Plaintiff's counsel explicitly asked Defendant's counsel on December 22, 2025 how to stop the scanning; Defendant said nothing. On January 5, 2026, Plaintiff's counsel asked again; Defendant's counsel provided no solution. Defendant first

disclosed the toggles on January 7, 2026, and first represented that those toggles have legal effect on January 12, 2026.

A party may avoid a term in a contract of adhesion where there was no mutual assent, "such as when the term is hidden in fine print… or otherwise undetectable." *Wingard v. Exxon Co., U.S.A.*, 819 F. Supp. 497, 502-503 (D.S.C. 1992). For a term to be enforceable in an adhesion contract, it must be "prominently placed, written in plain language," and the party must have "an opportunity to review" it. *Mitchell v. HCL Am., Inc.*, 190 F. Supp. 3d 477, 491 (E.D.N.C. 2016). Here, the opt-out was buried so deeply that even Defendant's own counsel could not locate it. A website managed by lawyers and technology professionals discussing the new Terms also concluded there was no opt-out available. (Exhibit D). These circumstances demonstrate a lack of mutual assent sufficient to invalidate Defendant's arbitration demand.

Moreover, Defendant's arbitration agreement is independently illusory because Defendant retains the unilateral power to modify any term of the agreement at will. The Eastern District of Virginia addressed this precise issue a few months ago in *Kiser v. Truist Fin. Corp.,* 796 F. Supp. 3d 207, 237-38 (E.D. Va. 2025), holding that an arbitration agreement was illusory where the defendant could unilaterally modify its terms:

"[Defendant] can change the arbitration agreement in any way that it sees fit, including the [Plaintiff's] ability to opt out of arbitration . . . [Defendant's] promise to arbitrate, and the terms that are to govern arbitration between the parties. The clause does not include any time-based limitations or restrict [Defendant's] ability to make unilateral, retroactive modifications, meaning that if a customer sought to invoke the arbitration agreement to resolve a dispute with

[Defendant], nothing prevents [Defendant] from unilaterally modifying it if it decided that it no longer wished to arbitrate that dispute." *Id.* at 237-38.

Like the defendant in *Kiser*, Defendant here "never agreed to be bound by anything" but instead "retained the ability to hold [Plaintiff] to [his] promises while also reserving for itself a unilateral escape hatch to activate whenever it sees fit." *Id.* at 238. Defendant's Terms of Service grant Defendant the same unfettered power to modify the arbitration agreement -- including modifying Plaintiff's ability to opt out, changing the arbitral forum, altering the rules governing arbitration, or eliminating the arbitration provision entirely -- all without meaningful notice or consent. Under *Kiser* and *Johnson*, such an arrangement "is nothing more than an illusory promise, and thereby invalid." *Id.*

### F. Plaintiff States a Claim for Unconscionability.

Defendant argues that the 2026 Terms are not unconscionable because "millions of users' acceptance" demonstrates reasonableness. ECF 22 at 12. This argument proves nothing -- millions of users may have "accepted" terms they did not read, could not understand, and felt powerless to reject.

**Procedural Unconscionability.** Under Fourth Circuit precedent, the factors determining unconscionability include "the relative disparity in the parties' bargaining power; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause." *Carlson v. General Motors Corp.*, 883 F.2d 287, 293 (4th Cir. 1989) (quoting *Kaplan v. RCA Corp.*, 783 F.2d 463, 467 (4th Cir. 1986)). Procedural unconscionability may arise from "hidden or unduly complex contract terms; the

adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract." *Meadows v. Cebridge Acquisition, LLC*, 132 F.4th 716, 730 (4th Cir. 2025) (quoting *Brown v. Genesis Healthcare Corp.*, 729 S.E.2d 217, 227 (W. Va. 2012)). Here, multiple factors are present: Plaintiff had no meaningful choice (Defendant's FAQs stated the only option was to "close your AOL account" – Exhibit B – FAQ 5); the opt-out mechanism was hidden so deeply that even Defendant's own counsel could not locate it until January 7, 2026; and Plaintiff had no reasonable opportunity to understand that such a mechanism even existed. *Cf. Mitchell v. HCL Am., Inc.*, 190 F. Supp. 3d 477, 491 (E.D.N.C. 2016) (finding only slight procedural unconscionability where arbitration provision was "prominently placed" and "written in plain language" and party "had the opportunity to review").

Defendant argues Plaintiff cannot complain about timing because he filed an AG complaint on November 27, Thanksgiving Day, the day he received notice of the new terms. ECF 22 at 12. This argument misses the point. The fact that Plaintiff immediately recognized something was wrong and sought immediate help demonstrates vigilance, not that Plaintiff had a meaningful opportunity to understand and negotiate the terms. Procedural unconscionability focuses on "inequities, improprieties, or unfairness in the bargaining process and formation of the contract." Meadows, 132 F.4th at 730. Filing a complaint with the Attorney General is evidence that Plaintiff lacked meaningful choice and had no other recourse but to seek outside assistance -- not evidence that the bargaining process was fair. Plaintiff's AG complaint, his December 22 inquiry to Defendant's counsel, and his December 31 formal notice all demonstrate attempts to address the issue through proper channels. The procedural unconscionability arises from Defendant's concealment of the opt-out mechanism until January 7, 2026, and its failure to acknowledge that

mechanism's legal effect until January 12, 2026 -- Plaintiff's diligence in seeking recourse does not cure these defects.

**Substantive Unconscionability.** Defendant argues the 2026 Terms cannot be substantively unconscionable because 30 million users will be bound by them. ECF 22 at 12. But the number of people bound by oppressive terms that they almost certainly never read nor understood does not make those terms less oppressive -- it makes the harm more widespread. Under Virginia law, substantive unconscionability exists where the "inequality is so gross as to shock the conscience." *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001); *see also Galloway v. Priority Imports Richmond, LLC*, 426 F. Supp. 3d 236, 244 (E.D. Va. 2019). Here, users face the impossible choice of accepting surveillance of twenty-five years of private communications or losing access to those communications entirely. This is precisely the type of "overly harsh" result that unconscionability doctrine is designed to prevent.

Moreover, Defendant's conduct demonstrates substantive unconscionability beyond the terms themselves. Defendant admits it has been scanning Plaintiff's emails since 2019 -- years before the 2026 Terms took effect. ECF 22 at 5. Defendant also scanned Plaintiff's emails on January 1, 2026 -- before the 2026 Terms took effect and after Plaintiff explicitly withdrew consent. These facts demonstrate that Defendant treats its own terms as illusory while holding users to strict compliance.

**G. The Factual Dispute Precludes Compelling Arbitration.**

The threshold question of whether an arbitration agreement exists is for the Court, not an arbitrator. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010). Where there is

a genuine dispute over whether the parties agreed to arbitrate, the Court must resolve that dispute before compelling arbitration.

Here, there are multiple factual disputes:

1. Whether Plaintiff ever clicked "I Accept" on the 2018 Terms (Plaintiff's sworn declaration says no)

2. Which Terms of Service govern (2017, 2018, or 2025)

3. Whether Plaintiff validly opted out of arbitration under the 2025 Terms (he did)

4. Whether the "will not apply to claims not yet filed" language controls (it does)

The Court should deny the motion to compel arbitration. Alternatively, the Court should conduct an evidentiary hearing on whether any valid arbitration agreement exists.

### III. OPPOSITION TO MOTION TO DISMISS

**A. Personal Jurisdiction Exists in Virginia.**

There is a factual dispute about which Terms of Service govern Plaintiff's account. Defendant argues that Plaintiff accepted the 2018 Terms of Service, which contain a New York forum selection clause. ECF 22 at 6-7. But Plaintiff's sworn declaration states that he never accepted those terms. ECF 3 ¶ 17. This dispute must be resolved in Plaintiff's favor at the motion to dismiss stage.

Moreover, any forum selection clause in the 2025 Terms is unenforceable for the same reasons the 2025 Terms are unconscionable, as discussed in Section II.F. Defendant cannot enforce a forum selection clause contained in Terms that were procedurally and substantively unconscionable.

Regardless of which Terms govern, Defendant sent the November 2025 notice directly to Plaintiff in Virginia. ECF 1 ¶ 17. Defendant contracts with Virginia residents and provides services to Virginia residents. These contacts are sufficient for specific personal jurisdiction over claims arising from those contacts.

Virginia's long-arm statute extends personal jurisdiction to the fullest extent permitted by due process. Va. Code § 8.01-328.1. Defendant purposefully directed its activities toward Virginia residents by contracting to provide email services to Plaintiff and millions of other Virginia users, sending notices to Virginia users, and deriving revenue from Virginia users. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (personal jurisdiction proper where defendant "deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum"). Defendant cites *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 321-22 (5th Cir. 2021), for the proposition that "[t]o target every user everywhere... is to target no place at all." ECF 17 at 4. *Johnson* is distinguishable. That case involved a media website's passive publication of content accessible nationwide. Here, Defendant entered into individualized contracts with Virginia residents, provided ongoing email services to those residents, stored their private communications, and sent targeted notices about material changes to their accounts. This is not passive, nationwide publication -- it is an ongoing contractual relationship with specific Virginia users that creates "continuing obligations" sufficient for specific personal jurisdiction under Burger King.

**B. Plaintiff Has Standing.**

Defendant's standing argument fails for the same reason: it rests entirely on the premise that Plaintiff accepted the 2018 Terms of Service. Plaintiff's sworn declaration states otherwise. This factual dispute must be resolved in Plaintiff's favor at this stage.

Moreover, even if Plaintiff had accepted earlier terms, he withdrew consent on December 17, 2025 (through the Virginia lawsuit), December 22, 2025 (through counsel in communication with Defendant's counsel, followed up via email – Exhibit C) and December 31, 2025 (formal written notice) (Exhibit E). Defendant's Privacy Policy states that users have "the right to withdraw consent at any time." ECF 17 at 12. Defendant scanned Plaintiff's emails on January 1, 2026 -- after Plaintiff clearly affirmed he did not consent and before the new Terms took effect.

Plaintiff has standing to challenge unauthorized scanning that occurred after he indisputably withdrew consent.

**C. Plaintiff Satisfied the Dispute Resolution Requirement.**

Defendant argues that Plaintiff failed to comply with the dispute resolution process before filing suit. ECF 22 at 7-8. This argument fails for multiple reasons.

First, Plaintiff substantially complied with any dispute resolution requirement. On November 27, 2025, Plaintiff filed a formal consumer complaint with the Virginia Attorney General regarding AOL's announced plan to scan user emails. ECF 1 ¶ 22. Plaintiff waited twenty days for a response before filing suit. On December 22, 2025, Plaintiff's counsel spoke with Defendant's counsel, explained that the dispute centered on email scanning, and wanted to resolve the matter if Defendant would simply stop scanning Plaintiff's emails. Defendant refused

to engage. On December 31, 2025, Plaintiff sent formal written notice to Defendant's legal department withdrawing consent and objecting to the modified Terms of Service. (Exhibit E)

Second, Defendant cannot enforce a dispute resolution requirement while simultaneously concealing the information necessary to resolve the dispute. The purpose of pre-suit dispute resolution is to allow parties to address issues before litigation. Here, Plaintiff repeatedly asked Defendant how to stop the email scanning. Defendant refused to answer for weeks. Only on January 7, 2026 -- after both lawsuits were filed -- did Defendant reveal that toggles existed. And only on January 12, 2026 did Defendant represent that those toggles had legal effect. Defendant cannot hide the ball and then claim Plaintiff failed to follow proper procedures.

Third, any failure to follow the precise dispute resolution process was excused by futility. Under Virginia law, performance of a contractual condition precedent may be excused where "the performance of the condition would be a useless act, as when defendant has repudiated the contract or has refused to perform." *Waller v. Welch*, 154 Va. 652, 662, 153 S.E. 722 (1930); see also *Hurt v. Caton*, 83 Va. App. 745, 764 (2025) (reaffirming Waller). Defendant's conduct demonstrates that no amount of pre-suit negotiation would have resolved this dispute. Plaintiff received no response to his AG complaint, no response to his December 22 inquiry seeking information about an opt-out mechanism, and no response to his December 31 formal written notice. Defendant continued scanning Plaintiff's emails on January 1, 2026, despite all of Plaintiff's efforts. Under these circumstances, strict compliance with additional procedural requirements would have been futile.

Moreover, Virginia courts recognize that "a substantial compliance with [notice requirements] is sufficient" where the underlying purpose of the notice provision has been

achieved. *Bowles v. City of Richmond*, 147 Va. 720, 727, 129 S.E. 489, 490 (1926); see also

*AMEC Civil, L.L.C. v. Commonwealth*, 74 Va. Cir. 492, 499, 505 (2008) (actual notice satisfies

notice requirements where defendant had opportunity to investigate and was not prejudiced).

Defendant had actual notice of Plaintiff's objections through multiple channels and simply

refused to act.

### D. Plaintiff States a Claim Under the Stored Communications Act and Electronic Communications Privacy Act.

Defendant characterizes Plaintiff's SCA and ECPA claims as "speculative" because

Plaintiff alleged that Defendant "may have" violated these statutes. ECF 22 at 8-10. This

characterization ignores the fact that only in Defendant's MTD filings on January 12, 2026, did

Defendant concede that indeed it has been searching Plaintiff's emails since at least 2019. This

was information fully within Defendant's control, to which Plaintiff did not have access.

Plaintiff alleges that Defendant announced it would begin scanning emails on January 2,

2026. ECF 1 ¶¶ 22-24. Plaintiff alleges that Defendant's Privacy Policy authorizes scanning and

disclosure to third parties. *Id.* ¶¶ 50, 59. Plaintiff further alleges -- and Defendant does not

dispute -- that Defendant was indeed searching his emails on January 1, 2026. See ECF 17 at 1-2

and 12 (describing email analysis features that Plaintiff could "turn off").

The "upon information and belief" language relates to scanning that may have occurred

since 2018, which Plaintiff could not verify without discovery but which Defendant has now

conceded. Plaintiff has adequately alleged that Defendant scanned his emails after January 1,

2026, without lawful consent.

Defendant suggests Plaintiff's allegations are "internally inconsistent" because the Complaint alleged scanning would begin January 2, 2026, while also alleging scanning may have occurred since 2018. ECF 17 at 13-14. This mischaracterizes the Complaint. At the time of filing, Plaintiff alleged what he knew: that Defendant announced scanning would commence on January 2, 2026. Plaintiff used "upon information and belief" language for potential past scanning precisely because he did not have access to that information. Defendant has now confirmed what Plaintiff suspected -- that Defendant was indeed scanning Plaintiff's emails since 2019. ECF 17 at 1-2. This is not inconsistency; it is Defendant confirming the very conduct Plaintiff alleged "upon information and belief."

Defendant's "consent" defense fails because: (1) Plaintiff never accepted the 2018 Terms that purportedly authorized scanning (sworn declaration, ECF 3 ¶ 17); (2) even if he had, he withdrew consent on December 22 and December 31, 2025; and (3) scanning still continued through January 7, 2026.

**Statute of Limitations**

Defendant asserts that the SCA and ECPA's two-year statute of limitations bars claims arising before January 2024. This argument fails.

First, the Wiretap Act's statute of limitations incorporates a discovery rule. A civil action must be commenced no later than "two years after the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e). Plaintiff did not have a reasonable opportunity to discover that Defendant was scanning his emails until Defendant admitted it in its Motion to Dismiss filed January 12, 2026. See *Smith v. Husband*, 376 F. Supp. 2d 603, 612 (E.D. Va. 2005) (applying § 2520(e) discovery rule); *Brown v. Am. Broad. Co.*, 704

F.2d 1296 (4th Cir. 1983) (holding that the issue of when the victim knew or should have known of the violation is a question for the jury). Defendant's 2017 Privacy Policy represented that AOL would not read Plaintiff's emails. Plaintiff reasonably relied on this representation. Defendant's scanning was covert and undetectable by ordinary users. Plaintiff had no means of discovering the scanning until Defendant's litigation admission. The limitations period therefore did not begin to run until January 12, 2026, and Plaintiff's claims are timely as to all scanning from 2019 forward.

Second, the continuing violation doctrine applies. Where a defendant engages in an ongoing pattern of unlawful conduct, each act restarts the limitations period. Defendant does not deny that it scanned Plaintiff's emails continuously from 2019 through January 7, 2026. Each instance of unauthorized access constitutes a separate violation of 18 U.S.C. § 2701(a). Even if the discovery rule did not apply, violations occurring within the two-year period preceding the filing of this action are independently actionable.

Third, some of Plaintiff's claims arise from scanning after December 22, 2025 -- well after he unambiguously withdrew consent. Plaintiff unambiguously withdrew consent through counsel on December 22, 2025, and again in formal writing on December 31, 2025. Defendant continued scanning through January 7, 2026 -- after Plaintiff withdrew consent and after Defendant's counsel received Plaintiff's written objection. This post-withdrawal scanning is clearly within the statute of limitations and clearly unauthorized under any theory.

### E. Plaintiff States a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

Defendant argues that it cannot breach the implied covenant by exercising a valid contractual right to modify its terms. ECF 22 at 11. This misstates Virginia law.

While a party may have a contractual right to modify terms, that right must be exercised in good faith. Under Virginia law, "although the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998); see also *Enomoto v. Space Adventures, Ltd*., 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (applying same principle).

Here, Plaintiff alleges that for more than twenty years, AOL represented that it would not read users' private email communications. ECF 1 ¶¶ 9-13. Plaintiff alleges that Defendant exercised its modification right to destroy the very benefit users bargained for -- email privacy -- while making it virtually impossible to withdraw consent. Defendant also implies it has been searching his emails since 2019. Yet Plaintiff provided a signed declaration stating that he never agreed to such searching which turned out to be part of the 2018 terms. Further, with regard to the 2026 terms, the concealment of the opt-out mechanism, the timing of the notice over a major holiday, and the January 1 scanning -- despite Plaintiff's repeated demands that his emails not be searched -- all support an inference of bad faith. Moreover, shortly after Plaintiff filed the Loudoun Circuit Court Virginia lawsuit, Defendant's prior Privacy Policy -- which represented that AOL would not read users' emails -- became publicly inaccessible, returning 403 errors. Plaintiff had obtained a copy of this policy on November 27, 2025, but by the time of filing, the same URL was no longer accessible. This conduct further supports an inference of bad faith.

### F. Plaintiff States a Claim for Unconscionability.

Defendant argues that the 2026 Terms are not unconscionable because millions of users accepted them. ECF 22 at 11-12. This argument proves nothing. Millions of users may have

accepted terms they did not read, could not understand, or otherwise felt powerless to reject. (see *e.g.* Exhibit D)

Procedural unconscionability exists where: the contract is non-negotiable; notice was provided over a major holiday with a five-week deadline; the opt-out mechanism was buried and undisclosed; and even Defendant's own counsel worked hard to locate toggle information. ECF 17-3. Defendant attempts to conflate "AOL Marketing Preferences" for advertising with the privacy toggles that control email scanning. ECF 17 at 12-13. These are not the same thing. Marketing preferences govern how AOL uses information for advertising offers; the email scanning toggles govern whether AOL reads the contents of a user's private communications. Defendant's own counsel did not know about the email scanning toggles until January 7, 2026 -- demonstrating that even sophisticated parties could not locate this mechanism.

Substantive unconscionability exists where: users face the choice of "accept surveillance or lose twenty-five years of emails"; the modification fundamentally changes the nature of the service; and Defendant began scanning before the new terms even took effect.

### G. Plaintiff States a Claim Under the Virginia Consumer Protection Act.

Plaintiff's VCPA claim is based on the following prohibited practices:

Va. Code § 59.1-200(A)(5): Misrepresenting the characteristics of goods or services -- Defendant represented for over twenty years that it would not read users' private email communications, then materially changed this representation while concealing the mechanism to opt out.

Va. Code § 59.1-200(A)(6): Misrepresenting the standard or quality of goods or services -- Defendant's service was marketed as private email; it then became surveillance-enabled email.

Va. Code § 59.1-200(A)(14): Using deception in connection with a consumer transaction -- Defendant's FAQs suggested there was no way to opt out of email scanning (Exhibit B – FAQ 5). Defendant's Privacy Policy stated that users could withdraw consent "at any time" but Defendant concealed the mechanism to do so. When Plaintiff's counsel explicitly asked how to stop scanning on December 22, 2025, Defendant said nothing about the toggles. Defendant's own counsel admitted he worked hard to obtain this information from his client. ECF 17-3.

Defendant argues that Plaintiff's VCPA claim is subject to Rule 9(b)'s heightened pleading standard. A VCPA claim does not require the same particularity as common law fraud. See *West v. Christopher Consultants*, 106 Va. Cir. 6, 10-11 (Loudoun Cty. 2020) (rejecting argument that "VCPA claims also sound in fraud and must be pleaded with particularity" because VCPA is remedial legislation and "prohibits a whole host of deceptive practices, fraud being merely one way of proving a violation thereof"). Even if Rule 9(b) applied, Plaintiff has satisfied it by identifying specific misrepresentations (the FAQs stating no opt-out existed while the Privacy Policy claimed users could withdraw consent "at any time"), the dates (November 2025 through January 12, 2026), the manner of communication (FAQs, Privacy Policy, and counsel's direct statements), and how Plaintiff was misled (Defendant failed to disclose the privacy toggles despite repeated direct inquiry on December 22, January 2, and January 5).

**H. Promissory Estoppel.**

Plaintiff acknowledges that Virginia courts have held that promissory estoppel is not a cognizable cause of action under Virginia law. *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 254

Va. 514, 521 (1997). Plaintiff requests that Count VI be dismissed without prejudice, or alternatively, that the Court construe the allegations as supporting Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

## IV. COLORADO RIVER ABSTENTION IS NOT WARRANTED

Defendant asks the Court to abstain under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). The doctrine does not apply here.

First, the federal claims (SCA and ECPA) are not pending in state court. Federal courts do not abstain when federal questions are present. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 25-26 (1983) ("the presence of federal-law issues must always be a major consideration weighing against surrender" of federal jurisdiction). Moreover, the Colorado River factors do not favor abstention. This Court is not inconvenient -- both parties have counsel in Virginia. There is no piecemeal litigation risk -- the federal claims can only be adjudicated here. And the federal action was filed only six days after the state action, with no proceedings having occurred in state court before this case was filed.

Second, Defendant's "reactive or vexatious" argument is contradicted by every fact in the record:

Plaintiff filed a consumer complaint with the Virginia Attorney General on November 27, 2025 -- before filing any lawsuit.

Plaintiff waited twenty days for a response before filing suit.

At the time of filing, Plaintiff believed -- based on Defendant's own representations -- that email scanning would commence on January 2, 2026. Plaintiff's urgency reflected a sincere

effort to prevent what he understood to be imminent harm to his privacy. That Defendant has since admitted it was scanning Plaintiff's emails for years without disclosure does not transform Plaintiff's good-faith lawsuit into a "vexatious" one. If anything, Defendant's failure to disclose the truth -- including during the December 22 call when Plaintiff's counsel was willing to provide an extension in exchange for Defendant simply agreeing to stop scanning -- demonstrates that Defendant, not Plaintiff, acted in bad faith.

Defendant refused to engage. Defendant did not mention the toggles. Defendant continued scanning emails, including on January 1, 2026 -- after Plaintiff's unambiguous withdrawal of any consent.

On January 7, 2026, Defendant disclosed for the first time that opt-out toggles existed. Plaintiff immediately used them, setting email searches to "off." But Plaintiff remains uncertain whether Defendant will honor this setting. Defendant's documents are internally contradictory: the Privacy Policy states users may withdraw consent "at any time" and "still be able to enjoy our Services," ECF 17 at 12, but the FAQs affirmatively state that users who do not agree must "close your AOL account." (Exhibit B -- FAQ 5). Further, Plaintiff cannot download his own emails to preserve them without clicking through terms that authorize email searching -- which Defendant could argue constitutes renewed consent. Plaintiff is thus caught in an impossible position: he cannot preserve his own data without potentially undermining his legal position. Until this Court resolves the parties' rights, Plaintiff has no assurance that his opt-out will be honored or that his attempts to preserve evidence will not be used against him.

Only on January 12, 2026, in Defendant's Opposition brief, did Defendant formally represent that the privacy toggles are legally binding.

This is not a plaintiff engaged in "procedural fencing." (ECF 17 at 8)[1] This is a plaintiff who tried every available avenue to avoid litigation and was forced into court by a defendant that concealed critical information for weeks.

## V. PLAINTIFF'S DAMAGES CLAIMS PROCEED

Regardless of the preliminary injunction issue, Plaintiff's claims for damages remain pending:

**A. Statutory Damages Under SCA and ECPA.** Plaintiff seeks statutory damages for unauthorized access to and disclosure of Plaintiff's stored communications. If Plaintiff never accepted the 2018 Terms (as his sworn declaration states), every scan from 2019 forward was unauthorized. Further, scanning from January 1, 2026 forward -- is unauthorized as a matter of law, even based upon Defendant's assertions. Defendant asserted that Plaintiff can withdraw consent at "any time". And Plaintiff did so, in writing multiple times beginning December 22, 2025. Yet Defendant never denies that it has been searching his emails from 2019 through January 7, 2026.

Moreover, Plaintiff seeks punitive damages under both statutes. The SCA provides for punitive damages where the violation is "willful or intentional." 18 U.S.C. § 2707(c). The Wiretap Act similarly provides for punitive damages "in appropriate cases." 18 U.S.C. § 2520(b)(2). Here, the evidence supports willfulness. Defendant scanned Plaintiff's emails for approximately six years without disclosure, despite Defendant's 2017 Privacy Policy

---

[1] Defendant's counsel lists fifteen cases over 3 years in a footnote apparently intended to suggest Plaintiff is a vexatious litigator. ECF 17 at 1 n.1. Plaintiff's counsel is a lawyer. Filing lawsuits on behalf of clients is what lawyers do. Defendant's counsel has presumably filed hundreds of motions to compel arbitration and motions to dismiss on behalf of corporate defendants -- that does not make each of those defendants engaged in "procedural fencing." The relevant question is whether *this* lawsuit was filed in good faith. The record conclusively establishes that it was.

representing that AOL would not read users' emails. Defendant continued scanning after Plaintiff explicitly withdrew (any such disputed) consent on December 22, 2025 and December 31, 2025. Defendant's counsel received Plaintiff's written objection on January 2, 2026, yet scanning continued through January 7, 2026. And Defendant concealed the opt-out mechanism for weeks despite repeated direct inquiries from Plaintiff's counsel. This is not inadvertent conduct -- it is a pattern of deliberate disregard for Plaintiff's privacy rights that warrants punitive damages.

**B. VCPA Violations.** Plaintiff seeks damages for Defendant's deceptive concealment of the opt-out mechanism and misrepresentations regarding email privacy. The VCPA permits treble damages for willful violations. Va. Code § 59.1-204(A). Defendant's conduct -- concealing the opt-out mechanism while its FAQs affirmatively stated there was no way to opt out, and continuing to scan emails after explicit withdrawal of consent -- supports a finding of willfulness.

**C. Attorney's Fees.** All three statutes under which Plaintiff asserts claims provide for mandatory attorney's fees to prevailing plaintiffs. The SCA provides for "reasonable attorney's fees and other litigation costs reasonably incurred." 18 U.S.C. § 2707(b)(3). The Wiretap Act provides for "a reasonable attorney's fee and other litigation costs reasonably incurred." 18 U.S.C. § 2520(b)(3). The VCPA provides for attorney's fees to prevailing plaintiffs. Va. Code § 59.1-204(B). As a matter of law, every hour Plaintiff's counsel spent on this matter from December 22, 2025 forward was necessitated by Defendant's refusal to disclose information that could have resolved this dispute without litigation. Defendant does not get to cause this crisis through concealment and then escape responsibility for Plaintiff's attorney's fees. Based upon the underlying facts, in which Plaintiff asserts he never agreed to the 2018 Terms of Service,

Plaintiff asserts that all searches of his emails beginning in 2019 were unauthorized, extending the coverable attorney's fees to those incurred before December 22 as well.

      D. **Potential Amendment to Add Disgorgement Claim.** Defendant admits it used Plaintiff's email content to "[c]reate analytics and reports for external parties, including partners, publishers, advertisers, apps, third-parties and the public." ECF 17 at 2. In other words, Defendant was monetizing Plaintiff's private communications for approximately six years without authorization. Plaintiff reserves the right to seek leave to amend to add a claim for unjust enrichment and disgorgement of profits Defendant derived from unauthorized scanning of Plaintiff's emails. See Restatement (Third) of Restitution and Unjust Enrichment § 3 (2011) ("A person is not permitted to profit by his own wrong.").

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court:

      1. Deny Defendant's Motion to Compel Arbitration;

      2. Deny Defendant's Motion to Dismiss, except as to Count VI (promissory estoppel), which may be dismissed without prejudice;

      3. Grant such other relief as the Court deems just and proper.

Dated: January 14, 2026

                                    Respectfully submitted,

                                    THOMAS RICHARDS
                                    By Counsel

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards
VSB No. 96671 / NY Bar No. 4932570
LWR Law Offices
3060 Williams Dr. Ste 300 #510
Fairfax, Virginia 22031
LWR@lwrlawoffices.com
(202) 981-2059
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on January 14, 2026, I caused the foregoing to be served via the Court's electronic

filing system, which will send notice to all counsel of record.

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards